PRAIRIE CREEK COAL MINING COMPANY v. KITTRELL.

Opinion delivered December 23, 1912.

1. MASTER AND SERVANT—DUTY TO FURNISH SAFE PLACE—NEGLIGENCE OF
MASTER.—In an action for damages for personal injuries, where
the uncontroverted proof shows that plaintiff was injured by the
falling of coal; and when the defendant's servant was charged
with the duty of making an inspection of the room where plaintiff
was required to work, and where there is no proof that any compe-
tent inspection was ever made; and where the exercise of ordi-
nary care on the part of the defendant's inspector would have
revealed the danger, the proximate cause of plaintiff's injury was
defendant's failure to make a proper inspection and his failure to
furnish a safe place for plaintiff to work, for which defendant
must respond in damages. (Page 146.)

2. MASTER AND SERVANT—DUTY TO INSPECT FOR DANGER.—Where the un-
disputed evidence fails to reveal any duty resting upon plaintiff
to inspect for dangers, instructions which charge the plaintiff
with such a duty are properly refused. (Page 147.)

3. SAME—CONTRIBUTORY NEGLIGENCE.—The question of contributory
negligence in an action for damages for personal injuries, is one
for the jury under the evidence, and is properly submitted under
an instruction which charges that the defendant can not recover
damages for personal injuries if the danger was open, patent, or
of such a nature as to be discoverable by any driver, and if the
plaintiff by the exercise of ordinary care could have easily seen
the defect, and if knowing or apprehending the danger failed to
exercise ordinary care. (Page 148.)

4. SAME—DAMAGES.—In assessing damages in an action for personal
injuries the elements to be considered are bodily pain, mental
anguish, the effect of the injury upon plaintiff's health, and the
pecuniary loss suffered from a diminished earning capacity, the
measure of which loss is the present value of these damages
during the expectancy of plaintiff's life, had the injury not oc-
curred. (Page 150.)

5. APPEAL AND ERROR—INVITED ERROR.—When one party invites error
by its own requested instructions, it can not be heard to complain.
(Page 149.)

6. APPEAL AND ERROR—MOTION FOR NEW TRIAL.—Assignments of errors
not made a ground for a new trial in the motion for a new trial,
can not be reviewed in the Supreme Court. (Page 151.)

Appeal from Sebastian Circuit Court, Fort Smith
District; *Daniel Hon,* Judge; affirmed.

STATEMENT BY THE COURT.

John Kittrell was employed as a driver in what is known as Prairie Creek Mine No. 4, in Sebastian County. On the 14th of September, 1911, while passing through one of the entries to the mine a large quantity of coal fell upon him and broke his back. Since that time he has been paralyzed from his hips down. He brought this suit against the Prairie Creek Coal Mining Company, his employer, to recover damages for his injuries, alleging negligence in the following particulars: That defendant "carelessly and negligently permitted coal to become loose in the upper rib or side of the entry at the place where Kittrell was required to pass in the performance of his duty as driver;" and had "carelessly and negligently failed to inspect said place;" and had "carelessly and negligently failed to remove loose coal from the upper rib and roof of said west entry;" and had "carelessly and negligently failed to place timbers under the same;" and had "carelessly and negligently failed to notify plaintiff of the said loose coal;" and had "carelessly and negligently failed to employ a competent inspector, a fire boss, whose duty it was to inspect said mines for loose coal," etc. That the inspector, John McKinney, "did not have sufficient knowledge and experience to be a fire boss and inspector in said mine, and was not of sober habits; that he frequently became intoxicated and went on duty in an intoxicated condition," which condition "rendered him incompetent to perform his duties, all of which facts were well known to the defendant. That by these concurring acts of negligence the plaintiff, while in the performance of his duty, received the injury."

The defendant denied all the material allegations, and set up the defense of contributory negligence and assumed risk. The facts are substantially as follows:

Appellee had had eight years' experience as a driver. Had been working in the mine where he was injured a little over a week. The duty of a driver is to drive a mule attached to a coal car. He usually picks up those cars at the entry where the miners place them, but if

the miners are not able to move the car out of the rooms the driver takes the mule into the room and pulls the car out. He also hauls timbers and props into the mine. He had no other duties except to haul coal from the mines and to haul timbers and other things in and from the mine. His duties were performed under the directions of his driver boss. No duties of inspection devolved upon him.

While the duty of a special inspection of the mine to protect the workers from danger did not devolve upon the driver, it was his duty, as well as the duty of coal diggers and all other employees in the mine, if they observed loose rock or any other dangerous thing during the day while in the performance of their respective duties, to report the same to the foreman or fire boss or some one having authority to remove it. This rule was for the protection of the employees. The driver, during the day, travelled the entry more than any one else, and the rule required that if he observed any danger in the entries or anywhere in the mine he was to report it for his own safety. The company relied upon any one who comes in contact with a danger during the progress of the work to examine and report it, but the duty of regular inspection of the mine devolved upon the fire boss. He made an inspection every day. His duties required him to inspect the mine generally. He went into the mine about 4 o'clock in the morning. He was to look after the gas and to see that there was no loose rock or coal or anything that would imperil the lives of the employees working in the mine.

On the morning of the injury Kittrell was returning from one of the rooms in the mine, driving his car, seated on the left-hand corner, in the usual place for the driver, and as he passed along the entry a large quantity of coal, from 500 to 1,000 pounds, fell upon him, breaking his back and paralyzing him as stated.

About a week or two previous the coal was all taken down between rooms 8 and 9. This was four or five yards from the entry between rooms 9 and 10, where

Kittrell was hurt. That coal fell down or was pulled down. There was about 3,500 pounds of it.

About six weeks before Kittrell was hurt, one of the miners observed that the coal was loose and ready to fall at any moment at the place where Kittrell was hurt. A witness described minutely the condition of this loose coal, showing that there were slips or cracks in the coal; that the same had been shot and was loose. "The top was loose and the dirt underneath crumbled off, and when pulled over from the back part there was a crack in the coal through which one could run his arm behind it." When coal was loose in the manner described one could discover that it was loose by hitting it with his hand and could tell from the sound that "it was drummy or loose." There were two layers of coal in the entry, and the crack was about a foot from the top layer; about a foot higher than the dirt band between the two layers.

Kittrell didn't see any crack in the coal between rooms 9 and 10. He didn't notice any difference in the coal at this place from any other place.

Those travelling in the entry and working in the rooms of the mine were furnished light by lamps which they usually carried on their caps. The lamp placed on the cap threw the light ahead so as to enable one to see ahead of him. Sometimes the lamps were carried in the hand. One going through the entry where Kittrell was hurt would hardly discover the crack in the coal. One witness discovered it because he sounded the coal and saw that it was "feathering out and loose there, and went back and looked for the crack and saw it was loose." The witness saw the coal was crumbling off at the top and felt and knew that there was something wrong with it. The presence of the crumbling coal led him to believe that the same was loose. He then made an examination and found that same was loose. The witness tested it for possibly twelve feet and found it drummy as far as he tested it. The coal was not bulged or sticking out, but merely loose.

Other witnesses who were experienced miners testified that they discovered that there was a crack in the

coal at the place where Kittrell was injured. The crack was in the neck of the room and four or five inches in width. One of the witnesses said that a man with a good light could see the crack six or seven feet, maybe ten feet. He could not say whether a man driving a car with a lamp on his head could see the crack or not from his position on the car. Another witness testified that his attention had been attracted to the place by one who had seen it. He discovered it, after he was warned of it, by examining it with his light. He says he could easily have seen it if he had paid any attention to it. "It could easily have been seen if you put a light right up against it." Another witness says that before Kittrell was hurt he noticed a dangerous piece of coal and a crack three or four inches. "It looked dangerous." The condition of the coal indicated that it was liable to fall at any time. He discovered it by the light of his lamp when he was pulling a car from the room. The coal stuck out some at this point. He noticed this the first time when he drove in there, which was about a month before Kittrell was injured.

Another witness stated that he noticed the crack which started in what he would call the neck of room 9. He could stick his hand in it. He noticed it while he was passing in the entry and it indicated to his mind that the coal was in a dangerous condition and that it was liable to turn over. "The bottom coal had been shot out from under it and there was nothing there to support it." He said that he discovered it by his light while going in the entry, and that it was not hard to discover going in that way if a man was looking for danger.

Another witness testified that about two months before Kittrell was injured he was laying track on second west entry and saw a crack in the rib and it scared him and he tried to pull it out and was unable to do so. He had been a coal miner thirty-five or forty years, and working in this mine off and on for eight years. From his experience as a miner he judged that there was a "squeeze" there. This meant the coal was loose. He says that a good miner could have found this place, and

the mine inspector could have seen it.   He further testified that the existence of a crack does not always show that coal is liable to fall immediately; that sometimes cracks appear in coal and stay for years and the coal does not fall.   Sometimes cracks appear in coal that do not indicate that the coal would fall immediately, but all cracks are not of that kind, and this was not of that kind. When he attempted to pull the coal down it didn't look like it would fall immediately unless somebody bothered it.   He tried to pull it out by himself but was unable to do so as he was without tools to do it with and without assistance.

W. B. Wechell, a witness on behalf of the appellant, testified that he was mine foreman from November, 1910, to the 5th of September, 1911; that he was succeeded as foreman by Joe Augurer.   He examined every entry in the mine, including second west entry.   He didn't remember exactly the condition of the stump or pillar between rooms 9 and 10 on the 5th of September, 1911.   He knew of nothing dangerous about it.   He made an examination by just simply going along and looking at the pillars at each side.   He didn't see any crack or other sign that indicated that it was necessary that the coal be taken down between rooms 9 and 10.   He says he didn't notice any "squeeze" between rooms 9 and 10. The reason he didn't see it, he says, was that probably it was not there when he was in there; he didn't think it was.   He states that there was a fall in the neighborhood of the entry at rooms 9 and 10 about a month before Kittrell was injured.   He was informed by the State mine inspector that there was a squeeze on in certain parts of the mine, but didn't remember whether he included second west entry or not.

Witness Joe Augurer testified that he was mine foreman of appellant on the day that Kittrell was injured. He was in the second west entry sometimes twice a day. He would make inspection of all entries as he would come in.   He was asked if anything was wrong with second west entry and answered, "No more than any other entry that I could see."   He didn't observe any danger in this

entry between rooms 9 and 10 before the accident. He states that the presence of a crack in the stump would not necessarily show that the mine was dangerous. It might show it. When a crack appears you can not always pull the coal down; sometimes you can and other times you can not. No one notified him of the dangerous condition of the entry before the accident. He did not see the crack in the second west entry about the neck of room 9; "didn't look for cracks along there."

Other witnesses testified that they worked in the mine, and if there was any dangerous condition of the coal between rooms 9 and 10 they did not see it. One witness testified that he passed rooms 9 and 10 often; that he saw the rib while he was working there before this accident and saw nothing wrong with it. He didn't inspect it.

The inspector testified, on behalf of appellant, that he inspected the second west entry on the day that Kittrell was injured. He says: "There was lots of loose coal in the second west entry, but it didn't look to me like it was dangerous. The second west entry was not dangerous to my idea of mining. Nobody ever told me anything about this mine being dangerous. I have knowledge enough and had eyes to see things that were dangerous. In making the inspection as fire boss I had a Wolf lamp and a Davy lamp. I guess I kept it in good condition. I always clean the lamps and keep them in good condition." On cross examination this witness testified in part as follows: "I laid off about September 3. They stopped my pay and I had to quit. I was not laid off because I was drunk. I laid off and sent another miner to take my place. It is not true that I was laid off because I was drunk. I was never laid off in my life. I never got fired in my life. Sometimes the best of us get drunk. It takes a good deal to make me drunk. I don't believe I was drunk five times at Prairie Creek mine in my life." He was asked if a little drink would make him drunk and answered, "Yes; about sixteen gallons," and said that he drank both Scotch and rye.

A witness, Mrs. Fannie Morgan, testified on behalf of appellee, in rebuttal, over the objection of appellant, in part as follows: John McKinney boarded at her house when he was fire boss. He quit soon after John Kittrell was hurt. He boarded at her house about six weeks before that. He was drinking more or less all the time he was at her house. There were more nights that he came in real drunk than when he was not drunk. He was supposed to go on duty at 3 o'clock. He generally left her house about 2 o'clock in the morning.

We will refer to such of the instructions as it is necessary to comment upon in the opinion. The verdict and judgment were in favor of the appellee in the sum of $8,000, and appellant duly prosecutes this appeal.

*Read & McDonough,* for appellant.

1. The motion to quash the service of the summons should have been sustained, because (1) the service was on a holiday, February 22, Washington's birthday. Kirby's Dig., § 501; 18 Ark. 534. (2) The service was not had a sufficient length of time, ten days, before the commencement of the term of court. If it be held that service on February 22 was a valid service, it does not follow that that day should be counted as one of the days contemplated by the statute. Kirby's Dig., § 6111; *Id.* § 7822; *Id.* § 501; 142 Cal. 441; 34 Kan. 212; 103 Va. 494, 49 S. E. 643.

2. The complaint was indefinite. 32 Ark. 315; 38 *Id.* 393; 60 *Id.* 39; 66 *Id.* 278; 77 Ark. 351.

3. No negligence is actionable unless it is the proximate cause of the injury. Thompson on Neg., § 4863.

4. Where there is a sharp conflict in the testimony, the court should not, as a matter of law, decide issues of fact. 75 Ark. 468; 95 *Id.* 48, 506; 97 *Id.* 560; 99 *Id.* 377; 100 *Id.* 433.

*Hill, Brizzolara & Fitzhugh,* for appellee.

1. The motion to quash, to make complaint more specific and to strike, etc., are not made grounds of the

motion for a new trial.    59 Ark. 599; 46 *Id.* 17; 64 *Id.*
483; 82 *Id.* 242; 72 *Id.* 250; 79 *Id.* 176.

2.    Admission of incompetent testimony is harmless
if the fact * * * is otherwise established by competent
testimony.    74 Ark. 417; 76 *Id.* 276; 78 *Id.* 7; 79 *Id.* 338;
88 *Id.* 484.

3.    As to the instructions, the court properly fol-
lowed 95 Ark. 477; 87 *Id.* 217.

WOOD, J., (after stating the facts).    The uncontro-
verted evidence shows that appellant was negligent in
not making proper inspection of the mine.    The negli-
gence of appellant in this respect was sufficiently set
forth in the complaint.

The undisputed evidence shows that there was a dan-
gerous place in the entry where appellee was injured,
caused by the shooting of coal, that could have been dis-
covered by the exercise of ordinary care upon the part
of appellant's inspector.    It is shown that the dangerous
condition of the overhanging coal could have been dis-
covered by the ordinary tapping of the same with the
hand or with any ordinary instrument; that if such an
inspection had been made the defect would have been
discovered by the drummy sound given forth.

The evidence also conclusively shows that the defect
could have been discovered by the exercise of ordinary
care in observing for defects with the lighted lamp pro-
vided for such purposes.    It is not shown that appel-
lant's inspector made any such effort to discover the
defects.    He simply says that he inspected the entry
"for loose rock and loose coal and such things as that,"
but he does not show how he made the inspection.    He
does not say that he looked for cracks with his lamp or
that he tapped on the ribs of coal to ascertain whether
same were loose or not.    In short, there was no proof
whatever on the part of the appellant to show that any
competent inspection was made; while the testimony on
behalf of the appellee, uncontroverted, shows that any
ordinary inspection of the dangerous place where appel-
lee was injured would have discovered the defect.    The
proximate cause of this injury therefore is the failure

upon the part of the appellant to make the proper inspection of its mine and the failure to exercise ordinary care, in this particular, to provide appellee a safe place in which to perform his duties as driver, and the court might have so declared as a matter of law.

Even if it be conceded that the issue of assumed risk was for the jury under the evidence, still the court did not err in refusing appellant's prayer No. 10*, in which it sought to have that issue submitted, because the first part of that prayer sought to have the jury also determine as to whether or not the appellee, under the evidence, was charged with the master's duty of inspecting and reporting on the condition of the ribs of coal for the purpose of making his own place of work safe. We are of the opinion that under the undisputed evidence this was not a question for the jury, and therefore the court did not err in refusing the prayer, even if the latter part of it, standing alone, be correct.

The appellant, in its brief and oral argument, insists that the duty devolved upon appellee to make an inspection and report any defects or dangers discovered to the proper authorities. In other words, that it was his duty, under the evidence, to inspect the mine to see that the place where he was working was safe, but we are of the opinion that the undisputed evidence shows that no such duty devolved upon the appellee. As we understand the evidence, his only duty was that of exercising ordinary care for his own safety while in the performance of his duties as an employee, but certainly there is no testimony to show that the appellant had imposed or devolved any duty upon him to make an inspection of the mine to see that same was safe. None of the master's duty, as we view the evidence, was imposed upon the appellee.

*Instruction No. 10, asked by appellant.
"The court instructs the jury that the defendant had the right to require the plaintiff as driver to keep a lookout for any dangers in the way of loose coal or other loosened objects while driving in said entry, and if the plaintiff in the discharge of his duty as driver knew that the company so relied upon him to report the condition of the entry and the coal thereon, then the plaintiff as to the condition of that coal was himself the master, and he can not recover. The plaintiff would be denied a recovery if the crack or defect in the coal was so open, patent and obvious that one passing could not avoid seeing or knowing about it, and the plaintiff must be held to have known it, and in that event, he assumed the risk of such defect and can not recover."

The only question about which there was a dispute or about which reasonable minds might draw different conclusions from the facts presented is as to whether or not the appellee exercised ordinary care for his own protection in the place furnished him by the appellant for the performance of his duties. In other words, whether there was any negligence on the part of appellee that, concurring with appellant's negligence, contributed proximately to his injury. This question was submitted to the jury upon instructions given at the request of the appellant which were more favorable to it than, under the evidence, it had a right to expect. For instance, in instruction No. 7, the court told the jury that "if the defendant relied upon the plaintiff as driver to keep a lookout for dangers in the entry, and if the plaintiff knew that such was the custom of the mine, and if he knew that the defendant did rely upon him to observe, or keep a lookout for defects or evidences of coal becoming dangerous so that it might fall, and if the plaintiff, knowing that the defendant was relying upon him to make report of any dangerous condition, failed to use ordinary care to keep such lookout in said entry, and if he failed to report the same, and if his injury is due to his failure to keep such lookout, and properly report any danger, then he is guilty of negligence and can not recover."

The eighth instruction given at the instance of appellant likewise presented substantially the same idea. These instructions were calculated to cause the jury to conclude that appellee had some duty to perform in the way of making observations or inspections of the mine in order to discover any defects existing and to report same in order that the place where he was working might be made safe. But, as we have said, this was not the duty of appellee at all under the evidence, and therefore the instructions were more favorable to appellant than the proof warranted, and hence it has no cause to complain.

The court granted appellant's prayer No. 12, which correctly submitted the question of contributory negligence. That instruction is as follows: "If the defect,

if there was one, was open, patent, and of such a nature as to be discoverable by any driver going along the entry in the discharge of his duties, and if the plaintiff, by the use of his eyes, or by ordinary care, could have easily seen said defect, and if he knew and apprehended the dangers and failed to exercise ordinary care in avoiding the same, and if he was injured thereby, he can not recover.''

We think the question of contributory negligence was one for the jury under the evidence, and that this instruction properly submitted it.

The appellant complains of the giving of the seventh instruction at the instance of appellee, which is as follows:

''The plaintiff had the right to presume that the defendant had discharged its duty to him in making its entry a reasonably safe place in which to perform his duties; and plaintiff was not required to inspect said rib or the side of said entry, or to search for defects therein, but was required to use ordinary care for his own safety, such care as a reasonably prudent person would exercise under like circumstances and conditions.''

The instruction was in accord with the undisputed testimony on the question of inspection. The court was justified, under the undisputed evidence, in telling the jury, as we have already observed, that the plaintiff was not required to make any inspection or to search the mine for defects. The verdict of the jury was responsive to the undisputed evidence on this issue, and appellant has no right to complain if other instructions given in its behalf, that should not have been given, are seemingly in conflict with this. The error consisted in granting appellant's prayers and was therefore invited by it, and it will not be heard to complain.

What we have already said disposes of the ruling of the court in refusing the ninth and other prayers of appellant for instructions. The appellant attempted to have the cause submitted upon the erroneous theory that there was evidence to warrant the conclusion that some

duty devolved upon appellee to make an inspection of the mine.

The instructions given at the instance of the appellee were, for the most part, bottomed on the law as declared by this court in the cases of *Mammoth Vein Coal Co.* v. *Looper,* 87 Ark. 217, and *Bauschka* v. *Western Coal & Mining Co.,* 95 Ark. 477.

The appellant complains of the instruction on the measure of damages, which is as follows:

"If the jury find for the plaintiff, they will assess his damages at such a sum that will compensate him for the bodily injury sustained, if any; the physical pain and mental anguish suffered and endured by him in the past, if any, and that which will be endured in the future, if any, by reason of the said injury; the effect of the injury on his health according to the degree and probable duration of the same, if any; his loss of time, if any; and his pecuniary loss from his diminished capacity for earning money through life according to what you find his probable expectancy, if he had not received the injury complained of, if any, and the amount of money expended for medicine and medical attention, if any; and from these as proven from evidence assess such damages as will compensate him for the injuries received."

The appellant contends that appellee should not recover for the full expectancy of his life before the injury occurred, when the evidence shows that by reason of the injury he will not live more than six months. The appellee had a right of action against appellant as soon as the injury occurred, for all damages he had sustained, caused by the negligence of appellant. The true measure for loss of earning power is the present value of these damages during the expectancy of appellee's life had the injury not occurred. By reason of the injury appellee was rendered a helpless and hopeless paralytic with a total loss of earning power for the full period of his expectancy. Certainly this is one element of his damages. Another element is the bodily pain and mental anguish on account of his condition, which he must

endure as long as he lives.    Other elements are also mentioned in the instruction.

The instruction was in accord with the rule and principle approved by this court in the recent case of *St. Louis, I. M. & S. Ry. Co.* v. *Brown,* 100 Ark. 107, and *St. Louis, I. M. & S. Ry. Co.* v. *Brogan,* 105 Ark. 533.

Appellant complains of the rulings of the court in admitting testimony.  We have examined these and find no error prejudicial to appellant.

The appellant also assigns as error the rulings of the court in refusing to grant its motion to quash the service, and in refusing to grant motions to have the complaint made more specific, and to strike out certain portions thereof.  These assignments are the proper subjects for bills of exceptions and they are not made grounds of the motion for a new trial, and hence we can not review them.  *Danley* v. *Robbins,* 3 Ark. 144; *Steck* v. *Mahar,* 26 Ark. 536; *Merriweather* v. *Erwin,* 27 Ark. 37; *Lambert* v. *Killim,* 27 Ark. 549; *Worthington* v. *Welch,* 27 Ark. 464; *Phillips* v. *State,* 62 Ark. 119; *Wise* v. *Martin,* 36 Ark. 305.

Affirmed.